No. 22-1566

**In the**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

———————————

**TRUSTEES OF SHEET METAL WORKERS LOCAL 7**
**ZONE 1 PENSION FUND; TRUSTEES OF SHEET**
**METAL WORKERS LOCAL 7 ZONE 1 HEALTH AND**
**WELFARE FUND; and TRUSTEES OF SHEET METAL**
**WORKERS LOCAL 7 ZONE 1 FIVE CITIES**
**ASSOCIATION JOINT APPRENTICESHIP AND**
**TRAINING FUND,**
*Plaintiffs/Appellants*,

-vs-

**PRO SERVICES, INC.,** a Michigan Corporation
*Defendant/Appellee*

**On Appeal from the United States District Court**
**for the Western District of Michigan, Southern Division**
**Case No. 18-01443 - Honorable Jane M. Beckering**

———————————

**BRIEF OF APPELLEE PRO SERVICES, INC.**

———————————

Elizabeth A. Favaro (P69610)
William H. Horton (P31567)
**GIARMARCO, MULLINS & HORTON, P.C.**
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, Michigan 48084-5280
(248) 457-7000

*Attorneys for Defendant/Appellee*

i

# **TABLE OF CONTENTS**

**PAGE NO.**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF ISSUE...............................................................3

STATEMENT OF THE CASE............................................................4

SUMMARY OF THE ARGUMENT ......................................................6

STATEMENT OF FACTS .............................................................8

   A.  The Collective Bargaining Agreement ............................................8

   B.  The FMTs work only in the manufacturing industry...................................10

   C.  Proceedings Below.........................................................13

ARGUMENT ......................................................................16

   A.  Standard Of Review .......................................................16

   B.  The district court correctly interpreted the CBA to determine that it applies only to work performed within the construction industry........................16

    1.  The district court properly considered the title as part of the CBA .............17

    2.  The district court properly harmonized the title with the CBA as a whole to determine that the CBA applies only to the construction industry. ........22

CONCLUSION....................................................................33

CERTIFICATE OF COMPLIANCE.....................................................34

CERTIFICATE OF SERVICE ........................................................35

ADDENDUM ....................................................................36

## TABLE OF AUTHORITIES

**PAGE NO.**

**Cases**

*Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519 (1947)......... passim

*Bunn Enterprises v. Ohio Operating Engineers Fringe Ben. Programs*, 606 F. App'x 798 (6th Cir. 2015) ............................................................................31

*Burrows v. Delta Transp. Co.*, 106 Mich. 582; 64 N.W. 501 (1895)......................27

*C.f., Jenkins v. U.S.A. Foods, Inc.*, 912 F. Supp. 969 (E.D. Mich. 1996) ..............22

*Central States, Southeast and Southwest Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454 (6th Cir. 1989) ................................................................................16

*Central States, Southeast and Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506 (6th Cir. 2008)...................................................................16

*Coffey v. New Hampshire Judicial Ret. Plan*, 957 F.3d 45 (1st Cir. 2020)............20

*Equitable Life Assur. Soc. of U.S. v. Poe*, 143 F.3d 1013 (6th Cir. 1998) .............30

*In re G-I Holdings, Inc.*, 755 F.3d 195 (3d Cir. 2014) ........................ 14, 23, 25, 26

*In re Greektown Holdings, LLC*, 728 F.3d 567 (6th Cir. 2013) ............................23

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76 (2d Cir. 2002)20

*Int'l Bhd. of Elec. Workers Local No. 683 Pension Tr. v. Advantage Enterprises, Inc.*, 813 F. Supp. 592 (S.D. Ohio 1993)........................................................28

*KMS Fusion v. United States,* 36 Fed. C1. 68 (1996)...................................... 21, 22

*M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) ................................17

*McKinstry Co. v. Sheet Metal Workers' Intern. Ass'n, Local Union No. 16*, 859 F.2d 1382 (9th Cir. 1988) ........................................................................8, 31

*MDY Indus., LLC v. Blizzard Entertainment, Inc.* (9th Cir. 2011)....... 14, 24, 25, 26

*Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (6th Cir. 1994) ...............................................................................................13

*N. Carolina Farm Bureau Mut. Ins. Co. v. Clear Tech., Inc.*, 601 F. App'x 181 (4th Cir. 2015) .................................................................................................. 20

*Operating Engineers Loc. 324 Health Care Plan v. G&W Const. Co.*, 783 F3d 1045 (6th Cir. 2015) ..................................................................................... 31

*P.K. Mgmt. Grp., Inc. v. Sec'y of Hous. & Urb. Dev.*, 987 F.3d 1030 (Fed. Cir. 2021) ...................................................................................................... 20

*Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355; 314 N.W.2d 440 (1982) ....................................................................................................... 28

*Sw. Airlines Co. v. Loc. 555, Transp. Workers Union of Am. AFL-CIO*, 912 F.3d 838 (5th Cir. 2019) ...................................................................................... 20

*Tonguette v. Sun Life & Health Ins. Co.*, 595 F. App'x 545 (6th Cir. 2014) .. 19, 25, 26, 27

*Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co.*, 48 F. App'x 188 (6th Cir. 2002) ............................................................................. 17

*United States v. Huntington Nat. Bank*, 574 F.3d 329 (6th Cir. 2009) .................... 23

*Waggoner v. C & D Pipeline Co.*, 601 F.2d 456 (9th Cir. 1979) ............................ 31

*Ward v. TheLadders.com*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014) .............................. 22

*Willis v. U.S. Bank*, Case No. 1:12-cv-1140, 2013 WL 593971 (W.D. Mich. Feb. 14, 2013) .................................................................................................. 28

**Statutes**

29 U.S.C. § 1145 ............................................................................................. 17

**Other Authorities**

11 R. Lord, Williston on Contracts § 30:2, p. 27 (4th ed. 2012) (Williston) .......... 18

Scalia, Antonin & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 35 (1st ed. 2012) .................................................................. 19

**Rules**

Fed. R. App. P. 32(a)(5) .................................................................................... 34

Fed. R. App. P. 32(a)(6) .......................................................................... 34

Fed. R. App. P. 32(a)(7)(B) .................................................................... 34

Fed. R. App. P. 32(a)(7)(C) .................................................................... 34

Fed. R. Civ. P. 56 .................................................................................... 16

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant/Appellee Pro Services, Inc. requests that this Court entertain oral argument to address outstanding questions regarding the legal issue in this case and to ensure that this Court is properly informed of the basis for this appeal.

## <u>STATEMENT OF JURISDICTION</u>

Appellants filed a timely Notice of Appeal on June 21, 2022 from the district court's Order denying Appellants' motion for reconsideration.  (Notice of Appeal, R. 133).  Pro Services does not contest jurisdiction.

## <u>STATEMENT OF ISSUE</u>

I.   Did the district court correctly determine that inclusion of the phrase "construction industry" in the collective bargaining agreement's title limited the agreement's application to that industry?

Plaintiffs/Appellants answer: "NO"

Defendant/Appellee answers: "YES"

## STATEMENT OF THE CASE

Defendant/Appellee Pro Services, Inc. supplies labor to manufacturing facilities and other customers throughout the country.   Some of Pro Services' employees, particularly those in the construction industry, are unionized; Pro Services pays fringe benefits and other contributions as required by those unions' collective bargain agreements.   However, Pro Services has another business division, which supplies non-union maintenance mechanics exclusively to customers in the manufacturing industry.   These workers, called "Full-Service Maintenance Technicians" ("FMTs"), perform the day-to-day repairs and maintenance to production equipment that is required to keep production lines running within manufacturing facilities.

Plaintiffs/Appellants are trustees of three multi-employer fringe benefit funds established to provide benefits to sheet metal workers pursuant to the terms of a collective bargaining agreement ("CBA") between the Five Cities Association of Michigan, of which Pro Services was a member, and a Michigan sheet metal workers' union.   The CBA is entitled "Standard Form of Union Agreement Form A-01-05 Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry."   (CBA, R. 107-3, PageID.2821) (emphasis added).   Appellants claim that the FMTs' work falls within the CBA's Trade Jurisdiction and they seek to recover $8 million from Pro Services in unpaid fringe

4

benefit contributions and liquidated damages for work performed by approximately 230 FMTs from January 2013 through March 2019.

On cross-motions for summary judgment, the United States District Court for the Western District of Michigan granted Pro Services' motion and denied Appellants' motion. As the district court explained: "The title is clear on its face that the CBA applies to employees performing covered work in the 'construction industry' and does not encompass employees performing covered work in other industries." (Opinion and Order, R. 125, PageID.3457-3458). Because it is undisputed that the FMTs work only in the manufacturing industry and not in the construction industry, the trial court held that, "the CBA does not impose on Pro Services the payment obligation that the Funds allege in this case." (*Id.*, PageID.3458).

Appellants sought reconsideration of this decision, which the district court denied, stating: "Plaintiffs argue that the Court cannot use the title of their contract to 'rewrite' the plain meaning of the text. Plaintiffs' motion presents the same contract interpretation issue ruled upon by the Court and will not be granted." (Order, R. 132, PageID.3532-3533).

## SUMMARY OF THE ARGUMENT

The district court's decision that Pro Services has no obligation to contribute to Appellants' fringe benefit funds for work performed by Pro Services' FMTs should be affirmed.  Although Appellant advocates for a blanket rule requiring titles to be disregarded in all cases, such a rule is inconsistent with basic principles of contract interpretation.  Contracts, including CBAs, are to be read as a whole, and titles and headings are permissive indicators of meaning so long as the body of the contract does not require them to be disregarded and they do not conflict with the contract's substantive terms.

The district court correctly applied this rule to the CBA.  The CBA does not contain a provision requiring the reader to disregard the title, and Appellants do not argue to the contrary.  And Appellant has not pointed to an actual conflict between the CBA's title and its substantive provisions.  The key provision describing the work covered by the CBA – Article I's Trade Jurisdiction – does not indicate that it applies to any industry other than the construction industry.

The district court harmonized Article I and other portions of the CBA with the title, holding that Pro Services has an obligation to make fringe benefit contributions on behalf of employees performing the work described in Article I only when such work is performed within the construction industry.  Because it is undisputed that Pro Services' FMTs do not perform work in the construction

industry, the district court correctly determined that Pro Services has no obligation to contribute to Appellants' fringe benefit funds on the FMTs' behalf.

Affirming the district court's decision is consistent with longstanding contract interpretation principles and the CBA's plain language. While Article I of the CBA is silent as to which industry it covers, other portions of the CBA support limiting the application of the CBA to the construction industry. Thus, contrary to Appellants' assertion, the title does not conflict with or re-write the CBA's substantive terms; it supports them.

Affirming the district court also makes good sense. Pro Services did not write or directly negotiate the CBA; rather, it is a standard form agreement reached by bargaining representatives. Employers such as Pro Services are therefore entitled to rely upon all of the words used in the CBA, including its title. Appellants' arguments, which reflect a misunderstanding of contract interpretation principles, require this Court to disregard the CBA's clear title, upon which Pro Services reasonably relied. And while Appellants would have this Court believe that Pro Services' position is an effort to avoid a payment obligation, the evidentiary record is clear that Pro Services is aware of and does in fact fulfill its obligation to pay fringe benefits when contractually required to do so. It is simply not contractually required to contribute to Appellants' funds in this case.

The district court's decision should be affirmed.

7

## STATEMENT OF FACTS

### A.    The Collective Bargaining Agreement.

For many years, Pro Services belonged to the Five Cities Association of Michigan, which on behalf of its members is a party to a collective bargaining agreement ("CBA").  It is undisputed that Pro Services did not negotiate the CBA directly.  Rather, the CBA is a standard form agreement, reached by bargaining representatives at the national level.  *See McKinstry Co. v. Sheet Metal Workers' Intern. Ass'n, Local Union No. 16*, 859 F.2d 1382, 1389 (9th Cir. 1988).  Modifications to this agreement are made between the Five Cities Association and the local sheet metal workers' union, then a copy of the CBA is provided to employers such as Pro Services.

The CBA is entitled "Standard Form of Union Agreement Form A-01-05 Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry."  (CBA, R. 107-3, PageID.2821) (emphasis added).  Employers such as Pro Services agree, under the terms of the CBA and the trust documents that are incorporated by reference (*Id.* at PageID.2833–2834), to contribute to the fringe benefit funds (of which Appellants are trustees) for work performed within the CBA's "Trade Jurisdiction."  The CBA defines the sheet metal workers' Trade Jurisdiction as the:

    (a)  manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration,

repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all air veyor systems, exhaust systems, and air-handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches whether manually drawn or computer assisted used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) operation of all automated or computer controlled fabricating equipment in the shop[;] (f) metal roofing; and (g) all other work in the jurisdictional claims of International Association of Sheet Metal, Air, Rail and Transportation Workers.

(*Id.* at PageID.2821). The Trade Jurisdiction is silent as to the industry to which this work applies. (*Id.*).

So too is Article III, which describes "Trade Jurisdiction Employees." But there are clues suggesting that it applies to the construction industry. It states: "The Employer agrees that none but journeymen, apprentice, preapprentice sheet metal workers shall be employed on any work described in Article I and further, for the purpose of proving jurisdiction, agrees to provide the Union with written evidence of assignment on the Employer's letterhead for certain specified items of work to be performed <u>at a jobsite</u> prior to commencement of work at the site." (*Id.* at PageID.2822) (emphasis added). "Jobsite" is defined by multiple sources as a location where work occurs, "especially construction." (*See* www.dictionary.com/browse/worksite; www.glosbe.com/en/en/jobsite; www.wordsense.eu/jobsite/).

Nowhere in the CBA is there any language stating that the CBA applies to all industries. Nor does the CBA state that its title is for convenience only or should be disregarded. (*See generally* CBA, R. 107-3, PageID.2820-2841).

Pro Services has taken the CBA's title literally – when it employed sheet metal workers (on whose behalf it made fringe benefit contributions), they worked exclusively in the construction industry. Pro Services' President testified that:

Q.    Did Sheet Metal Workers employed by Pro Services work in the building and construction industry?

A.    It was – yeah. <u>It was all in that</u>.

Q.    <u>All in the building and construction industry</u>?

A.    <u>Uh-huh [yes]</u>.

(Deposition of C. Petersen, R. 107-6, PageID.2856 (emphasis added)).

**B.    The FMTs work only in the manufacturing industry.**

Pro Services has a second business division that supplies non-union maintenance mechanics to manufacturing customers such as Benteler Automotive, Kaiser Aluminum, and Hi-Lex Controls, among others. (*See, e.g.,* Customer List, R. 107-9). These maintenance mechanics are called "Full-Service Maintenance Technicians" ("FMT"), a moniker that reflects work which Pro Services' owner describes as "reactive maintenance functions and troubleshooting" to keep production lines running. (Deposition of M. Vandemaele, R. 107-5, PageID.2851). Pro Services' President contrasts the FMT side of its business from the skilled

10

trades side as follows:

> "On the Skilled Trades side we'll do installation.  We'll do construction projects.  We'll do some outage work.  Outage or shutdowns.  And then on the maintenance side it's daily plant maintenance operations, which is a lot of – most of the time it's cleaning, things like that.  Cleaning, troubleshooting, looking for PM's [preventative maintenance]."

(Petersen Dep., R. 107-6, PageID.2855).

For instance, some of the FMTs deposed in this case testified that they perform electrical work on production equipment.  This can include changing sensors, adjusting a machine's software program, and repairing and replacing electrical wires.  (Deposition of FMT M. Horrall, R. 107-12, PageID.2874).  One FMT testified that on the day of his deposition, the customer he was working for – a company that makes products of corrugated cardboard – had a blower motor fail; his job was to take it apart and replace it.  (Deposition of FMT N. Glaspey, R. 107-10, Page.ID2868).  When a machine springs an air leak, an FMT fixes it. (Deposition of FTM D. Sivley, R.107-16, PageID.2908).  FMTs repair door locks and railings.  (Deposition of FMT Dennis Neely, R. 107-16, PageID.2903).  They repair machine guards.  (Deposition of FMT R. Cope, R. 107-14, PageID.2881).  Some even do building and grounds work.  (Deposition of FMT J. Valeron, R. 107-15, PageID.2884).  FMTs basically do any kind of job, no matter how odd, within a manufacturing facility that keeps production lines up and running.  As one FMT who Pro Services placed with Sturgis Molded Products put it: "It's hard to

11

tell what your day's going to be because you don't know what's going to fail today, what's going to be needed from you today, but the bulk was machine repair." (*Id.*).

It is beyond dispute that FMTs work exclusively in the manufacturing industry. As the district court noted, Appellants did "not advance the argument that FMTs work 'in the construction industry.'" (R. 125, PageID.3458). And Pro Services representatives, along with some FMTs themselves, testified unequivocally that FMTs do not perform work in the construction industry. (*See, e.g.* Vandemaele Dep., R. 107-5, PageID.2853; Deposition of R. Lemke of Pro Services, R. 107-8, PageID.2862-2863; Deposition of FMT N. Glaspey, R. 107-10, PageID.2869; Deposition of FMT Z. Selvidge, R. 107-11, PageID.2871; M. Horrall Dep., R. 107-12, PageID.2875-2876; Deposition of FMT J. Boden, R. 107-13, PageID.2878; R. Cope Dep., R. 107-14, PageID.2882; J. Valeron Dep., R. 107-15, PageID.2884; and all of Exhibit O to Pro Services' Brief in Support of Motion for Summary Judgment, R. 107-16, PageID.2885-2915).

Because its FMTs do not work in the construction industry, Pro Services does not make contributions to Appellants' fringe benefit funds on the FMTs' behalf. Pro Services is not, as Appellants allege, attempting to avoid a payment obligation. In fact, Pro Services is no stranger to making fringe benefit contributions. About 75 percent of its workforce consists of union labor, and it is

undisputed that Pro Services contributes to fringe benefit funds established by its collective bargaining agreements with those unions on behalf of its unionized employees. (*See* Deposition of J. Harloff of Pro Services, R. 107-7, PageID.2859).

### C.    Proceedings below.

Appellants filed this lawsuit after conducting a payroll audit authorized by the CBA, which they claim entitles them to $8 million in unpaid fringe benefit fund contributions and liquidated damages for FMT hours worked from January 2013 through March 2019. (Audits, R. 107-2, PageID.2805-2818).

After extensive discovery, the parties filed cross motions for summary judgment. Pro Services argued that the CBA's title reflects the parties' intention that its obligation to make fringe benefit contributions does not apply for employees working in industries other than construction. (*See generally* Pro Services' motion for summary judgment and brief in support, R. 106-107). Appellants' motion did not argue the contract language at all, but instead focused on an alleged failure by Pro Services to keep adequate records under *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (6th Cir. 1994). (R. 104-105). However, in response to Pro Services' motion, Appellants argued that the beginning of Article I's description of the sheet metal workers' trade jurisdiction stating, "all employees of the Employer engaged in but not limited to the . . ." means that the CBA applies to "all employees" of Pro Services,

13

regardless of industry, and invited the district court to ignore the CBA's title.  (R. 111 PageID.3283-3284).

The district court declined Appellants' invitation.  In granting Pro Services' motion and denying Appellants' motion, the district court held that due to the CBA's title, when read in harmony with the CBA's text, Pro Services did not owe the payment obligation that Appellants allege.  (Opinion and Order, R. 125, PageID.3458).  The district court reasoned:

> Here, the title of the parties' CBA expressly identifies the 'Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry' and therefore limits the class of workers for whom fringe benefit contributions must be made. The title is clear on its face that the CBA applies to employees performing covered work in the 'construction industry' and does not encompass employees performing covered work in other industries. In fact, the Funds [Appellants] have not pointed to any ambiguities in the language, opining only that Pro Services relies on the title in order to escape financial liability.  However, the Funds' argument would have this Court simply ignore the title, whereas the Supreme Court has instructed that 'the rule that contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan.'

(Opinion and Order, R. 125, PageID.3458-3459) (citation and quotations omitted).

Appellants sought reconsideration, arguing for the first time that the title of the CBA conflicts with the text, and citing for the first time *In re G-I Holdings, Inc.*, 755 F.3d 195 (3d Cir. 2014), *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519 (1947), and *MDY Indus., LLC v. Blizzard Entertainment, Inc.* (9th Cir. 2011).  (*See generally* Appellants' Brief in Support of Motion for

14

Reconsideration, R. 128). The district court ordered that Pro Services respond, which it did, arguing that the reconsideration motion improperly attempted to rehash prior arguments and, in any case, did not actually support a finding that there was a conflict between the title and the CBA's substantive provisions. (R. 131). In denying Appellants' motion, the district court reasoned:

> Plaintiffs argue that the Court cannot use the title of their contract to 'rewrite' the plain meaning of the text. Plaintiffs' motion for reconsideration presents the same contract interpretation issue ruled upon by the Court and will not be granted. Moreover, as set forth more fully in Defendant's response, Plaintiffs' argument lacks merit for the reasons previously stated by this Court and does not warrant a different disposition of the parties' motions for summary judgment.

(Order, R. 132, PageID.3531-3532).

This appeal followed.

**ARGUMENT**

**THE DISTRICT COURT'S DECISION GRANTING
SUMMARY JUDGMENT IN PRO SERVICES' FAVOR
SHOULD BE AFFIRMED**

## A.    Standard Of Review.

This Court reviews the district court's decision to grant summary judgment pursuant to Fed. R. Civ. P. 56 *de novo*. *Central States, Southeast and Southwest Areas Pension Fund v. General Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008). And it also reviews *de novo* the district court's interpretation and construction of the CBA. *Central States, Southeast and Southwest Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 458 (6th Cir. 1989).

## B.    The district court correctly interpreted the CBA to determine that it applies only to work performed within the construction industry.

The district court's decision regarding the parties' motions for summary judgment should be affirmed for two reasons. *First*, titles are contractual, so the district court correctly considered the CBA's title as part of the whole document. *Second,* Appellants' criticisms of the district court are based upon a misunderstanding of how titles should be considered when interpreting a legal text. Titles are disregarded only when the text requires it or when they conflict with a text's substantive terms. Because neither of those circumstances is present here, the district court properly interpreted the title in conjunction with the CBA's substantive terms to hold that the CBA applies only to work performed in the

16

construction industry.  And because it is undisputed that Pro Services' FMTs do not work in the construction industry, Pro Services has no payment obligation for their work.

### 1.    *The district court properly considered the title as part of the CBA.*

An employer's duty under ERISA to make fringe benefit contributions is triggered only when there is a written agreement evidencing such an obligation.  29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan … under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such … agreement.") (emphasis added).  As this Court has held: "This provision entitles multiemployer plans to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, the actual intent or understanding of the contracting parties is immaterial when the meaning of that language is clear."  *Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co.*, 48 F. App'x 188, 192 (6th Cir. 2002).

Here, the contract setting forth the payment obligation Appellants allege is the CBA, which must be interpreted according to the basic rules of contract interpretation.  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "Under the 'cardinal principle' of contract interpretation, 'the intention of the parties, to be gathered from the whole instrument, must prevail.'"  *Id.* at 443,

Ginsburg, J., concurring (quoting 11 R. Lord, *Williston on Contracts* § 30:2, p. 27 (4th ed. 2012) (Williston)).  "When the intent of the parties is unambiguously expressed in the contract, that expression controls." *Id.*

While Appellants cite this law generally and request that this Court apply the CBA's terms as written, what they really want this Court to do is to hold that titles are not relevant to contract interpretation and should not be considered in any circumstance.  According to Appellants:

> The title to the CBA is not a contractual provision.  It precedes the text and is not part of the contractual test.  Nothing in the title creates binding rights, duties or enforceable obligations.

Appellants' Brief at 19.

Appellants cite to no case law supporting this proposition, perhaps because it is not the law.  Rather, the role of titles and headings was succinctly described by the Supreme Court of the United States long ago in *Trainmen*, *supra.*  While titles cannot rewrite a contract, they are "tools available for the resolution of a doubt." 331 U.S. at 529 (emphasis added).  Thus, while Appellants suggest that the district court's consideration of the CBA's title to determine its meaning is somehow a novel or outrageous notion, *Trainmen* makes clear that titles are, indeed, contractual.  In fact, there is a canon of contractual interpretation that addresses this very issue: the "Title-and-Headings" canon provides that titles and heading are "permissible indicators of meaning."    Scalia, Antonin & Bryan A. Garner,

18

READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 35 (1st ed. 2012).

This Court has previously applied this canon to resolve a "doubt" about an ERISA benefit plan's provision. *Tonguette v. Sun Life & Health Ins. Co.*, 595 F. App'x 545 (6th Cir. 2014). In *Tonguette,* the plan called for termination of group life insurance coverage when a participant's employment ended, unless the participant opted to convert the policy to an individual one within 31 days. This time period was extended to 91 days if a participant did not receive notice of the option. The plaintiff's husband did not receive notice of his conversion option, and he did not exercise it before he died with six days remaining in the 91-day period. The plan's provision governing this situation was entitled "Death within the Conversion Period" and allowed payment under the policy if the participant dies *"during the 31 day period during which your insurance may be converted to an individual policy." Id.* at 546. The issue was whether this language referred to the length of the applicable conversion period under the plan, or only to the first 31 days following the termination of group coverage, even if the conversion period runs longer than 31 days. This Court used the provision's title to resolve the issue, finding that the "language refers to, <u>as the heading says</u>, 'death within the conversion period.'" *Id.* at 547 (emphasis added).

The Sixth Circuit is not alone – several federal circuits have at some point determined that the title of a text, as well as headings and captions within a text's

body, is relevant to a text's interpretation. *E.g., Coffey v. New Hampshire Judicial Ret. Plan*, 957 F.3d 45, 50 (1st Cir. 2020) (interpreting a provision of a judicial retirement plan adopted by the New Hampshire legislature based in part on its title, "Service Retirement Benefits," because, "'[w]hile the title of a statute is not conclusive of its interpretation, it provides significant indication of the legislature's intent in enacting the statute.'") (citation omitted, emphasis added); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 85 (2d Cir. 2002) (considering the title "War Exclusion Clause" to determine that the text following it covered war-related risks, reasoning that, "Captions are relevant to contract interpretation") (emphasis added); *N. Carolina Farm Bureau Mut. Ins. Co. v. Clear Tech., Inc.*, 601 F. App'x 181, 188 (4th Cir. 2015) (["T]he placement of the $20,000 monthly fee under the heading 'License Fee' … on the parties' contract … weighs in favor of [the defendant's] interpretation.") (emphasis added); *Sw. Airlines Co. v. Loc. 555, Transp. Workers Union of Am. AFL-CIO*, 912 F.3d 838, 846 (5th Cir. 2019) (holding that an arbitrator's award conflicted with "the plain language of the CBA" where the "arbitrator's interpretation failed to account for … the CBA's title page that sets February 19, 2016 through February 18, 2021 as the 'period' for the CBA[.]"); *P.K. Mgmt. Grp., Inc. v. Sec'y of Hous. & Urb. Dev.*, 987 F.3d 1030, 1032 (Fed. Cir. 2021) (rejecting the appellant's invitation to interpret a contract in a manner that would require the court to deem its titles

20

"meaningless.").

As in all of these cases, there was a "doubt" in this case about the CBA's meaning, and the CBA's title assisted to resolve it. The "doubt" was whether, as Appellants argue, the CBA applies to all industries, or whether, as Pro Services argues, it applies only to the construction industry. The district court's consideration of the CBA's title is consistent with the manner in which the United States Supreme Court stated titles are to be used in *Trainmen*: to resolve a "doubt."

It is also consistent with every other federal case Pro Services can find on this issue; there is no case law suggesting otherwise. The best Appellants can do is analogize titles to "whereas" clauses, which Appellants claim are "subordinate to the operative parts of the contract." (Appellants' Brief at pg. 19). However, in the case upon which Appellants rely for this assertion, *KMS Fusion v. United States,* 36 Fed. C1. 68 (1996), the court did not completely ignore the "whereas" clause, as Appellants suggest. Rather, the court treated the "whereas" clause the same way titles are to be treated – it considered it in conjunction with the substantive provisions to resolve a "doubt." The court explained:

> The evidence introduced at trial is sufficiently convincing that plaintiff placed an intense reliance on the fourth whereas clause and that DOE was aware of its importance to plaintiff. Consequently, the division in Mod 35 of the former paragraph 3.C into the fourth whereas clause and the expiration term of the contract had little effect on the meaning or importance of the language. <u>The terms of the fourth whereas clause—indeed, all of the four whereas clauses—remained</u>

substantive and an integral part of the contract. They will be accorded
weight as such.

*Id.* at 80 (emphasis added).

"Whereas" clauses are no different than titles, captions, and headings: all are tools for determining how a text should be interpreted.  A blanket rule requiring these tools to be ignored is without legal support and this Court should reject Appellants' request to apply such a rule here.

> **2.    *The district court properly harmonized the title with the CBA as a whole to determine that the CBA applies only to the construction industry.***

Though somewhat unclear, it appears that Appellants alternatively argue that even if the title is part of the CBA, it should nevertheless be disregarded. However, a review of decisions across the federal circuits reveals only two circumstances in which such an approach is appropriate.  *First,* titles (along with headings and captions) are disregarded when a provision in the text requires it. *C.f., Jenkins v. U.S.A. Foods, Inc.*, 912 F. Supp. 969, 975 (E.D. Mich. 1996) ("Although the caption to Article V of the Stock Purchase Agreement does read 'ACTION PRIOR TO THE CLOSING,' and the sentence underneath the caption repeats this, these must be disregarded, as section 11.07 of the Stock Purchase Agreement indicates that such titles and headings are inserted strictly for convenience and are not to affect the interpretation of the contract."); *Ward v. TheLadders.com*, 3 F. Supp. 3d 151, 162 (S.D.N.Y. 2014) (finding that because

22

there was "no language suggesting that the captions or section headings should be disregarded in interpreting the contract[,] the heading must be considered and given effect in contractual construction."). Here, there is no such provision in the CBA and Appellants do not argue to the contrary.

*Second,* titles are properly disregarded when they conflict with the contract's substantive text. This is the rule that has emerged from the cases relied upon by Appellants. As an initial matter, Appellants failed to preserve this argument for appeal because they waited to make it until their motion for reconsideration. "By waiting until a motion for reconsideration to raise their argument and not providing a good excuse for the delay, the Appellants forfeited it." *In re Greektown Holdings, LLC*, 728 F.3d 567, 575 (6th Cir. 2013). *See also United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009) ("[A] party does not preserve an argument [for appeal] by raising it for the first time in a motion for reconsideration or rehearing.").

Substantively, the rule is inapplicable to this case, and so are the cases upon which Appellants rely. For instance, *In re G-I Holdings, Inc.*, 755 F.3d 195 (3d Cir. 2014), involved a heading called "Third-Party Rights," and the substantive term stated: "All rights of action for any breach of this Agreement by any signatory hereto are hereby reserved to the Center, Participating Producers and to Supporting Insurers...." 755 F.3d at 202. The issue was whether the plaintiff-signatories to the

contract could sue under it, even though they were no longer "Participating Producers," but rather were now third parties.   The court disregarded the title because it conflicted with the intent as expressed in the provision:

> [W]e will not discount the plain language of the third sentence of that section merely because of the title.   A court 'may examine the [contract] heading as additional evidence tending to *support* the contract's substantive provisions.'   The title of a section cannot contradict or rewrite the plain language of the contractual provisions within that section.

*Id.* at 203 (citation and quotation omitted, emphasis in original and added).

A similar conflict existed in another case upon which Appellant relies, *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.2d 928 (9th Cir. 2010).   *MDY* involved a license agreement, one provision of which prohibited users of an online computer game from using robots or "bot" to play the game.   The at-issue heading stated: "Limitations on Your Use of the Service."   The issue was whether the provision conditioned certain uses of software on complying with various restrictions.   If the provision was a condition, then the plaintiff could proceed with a copyright infringement claim; if it was a covenant, then the plaintiff's cause of action was for breach of contract.   In holding that the provision's text contained no restrictions, the court noted the apparent conflict between the heading's use of the word "limitations" and the clear language of the substantive text and determined that despite the heading, the substance of the provision did not suggest that it was a condition.   *Id.* at 940.

24

*Trainmen, supra,* also involved a conflict between a provision's title and its substantive terms. There, representatives of railroad employees claimed intervention rights in a lawsuit seeking judicial review of a determination of the Interstate Commerce Commission. Their argument was based upon section 17(11) of the Interstate Commerce Act, which stated that: "Representatives of employees of a carrier, duly designated as such, may intervene and be heard in any proceeding arising under this Act affecting such employees." The railroads, however, argued that the provision's heading, "Commission procedure; delegation of duties; rehearings," limited intervention to proceedings before the Interstate Commerce Commission, to the exclusion of court proceedings. 331 U.S. at 527. In rejecting this argument, the Court acknowledged that while its heading failed to state that the provision dealt with judicial proceedings, the provision itself indicated that it referred to "all proceedings," which the Court – unremarkably – determined would include the subject lawsuit.

The treatment of the headings and title in *G-I Holdings, MDY,* and *Trainmen* is consistent with how this Court treated the heading's title in *Tonguette.* The title in the former cases conflicted with the contract's substantive terms, but the title in the latter supported the contract's substantive terms. The courts in each set of cases applied the same rule, but the outcome was different because the facts differed.

25

The district court's treatment of the title in this case is no different than this Court's treatment of the heading in *Tonguette* and does not conflict in any respect with *G-I Holdings*, *MDY,* or *Trainmen.*  As in *Tonguette*, the CBA's title does not contradict the substance of its provisions.  To be sure, Appellants have not pointed to any such contradiction between the CBA's title and any portion of the CBA. Instead, they make the unsupported claim that the title is not clear, asserting that the district court's finding to the contrary is "a dodge, to avoid explaining why it finds the matter is clear on its face," and then declaring that the district court's decision "is absurd."  (Appellants' Brief at 16).  What is absurd is Appellants' position that the title is not clear, when Appellants agree on page 22 of their brief that, "The parties and the District Court found the CBA to be unambiguous," and stated no fewer than four times in their summary judgment briefs that the CBA is unambiguous:

- "The language in the Collective Bargaining Agreement is clear and unambiguous."  (Plaintiffs' Brief in Opposition to Pro Services' Motion for Summary Judgment, R. 111, PageID.3282)

- "The CBA is clear and unambiguous."  (*Id.*, PageID.3284).

- "In their respective motions both parties claimed the CBA is unambiguous."  (Plaintiffs' Brief in Support of Motion for Reconsideration, R. 128, PageID.3463).

- "The CBA is not ambiguous."  (*Id.*, PageID.3466).

In addition, Appellants misinterpret *Trainmen* and the other cases upon

26

which they rely to incorrectly argue that titles should be considered only when a text is ambiguous. What *Trainmen* actually said was that titles can be considered to resolve a "doubt." 331 U.S. at 529. "Doubt" can arise even in an unambiguous contract, and a title or heading can resolve it. *Tonguette* is one example: "[R]ead in isolation, then, the … language appears ambiguous," which "ambiguity recedes, however, when one looks at the language of the relevant 'Part' of the plan as a whole," including the provision's heading. 595 F. App'x at 547.

Another example is *Burrows v. Delta Transp. Co.*, 106 Mich. 582; 64 N.W. 501 (1895). There, a state statute required that "vessels" have fire screens for smokestacks, but there was "doubt" about the type of vessel to which the statute applied because the body was silent on this point. The Michigan Supreme Court applied the statute's title referencing steam vessels to conclude that steam vessels were required to have smokestacks. The Court stated:

> The rule of construction of statutes requires that a reasonable interpretation be given to the language used in the provisions so as to accomplish the object sought to be reached. The aim and purpose of this statute is to compel steam vessels navigating the waters of this state to be provided with fire screens for smokestacks, and to provide a penalty for violation of this requirement. The object is clear, and the mere omission of the word "steam" before the word "vessels," in section 1 of the act, does not render the act repugnant in its terms. Clearly, it means all steam vessels.

*Id.* at 605-606.

A judge in the Western District of Michigan found a lease agreement

unambiguous through the assistance of a provision's title in *Willis v. U.S. Bank*, Case No. 1:12-cv-1140, 2013 WL 593971, *4 (W.D. Mich. Feb. 14, 2013) ("Michigan courts read contracts as a whole, giving harmonious effect to <u>each word and phrase when possible</u>.") (emphasis added).  And the Michigan Supreme Court considered a heading to find an insurance policy clear and unambiguous in *Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355; 314 N.W.2d 440 (1982) ("The capitalized reference at the bottom of the first page and <u>the capitalized heading</u> "Exclusions" on the second page of the endorsement involved here persuade me that <u>a fair reading of the entire policy should leave no doubt</u> that use of a vehicle not named in the policy which is either owned by the insured or furnished for his or her regular use is excluded from coverage.") (emphasis added).

In each of these cases, the courts read the at-issue texts as a whole – including their titles, captions, and headings – to determine their meaning, which is precisely what the district court did here.  Had the district court done otherwise by disregarding the title, it would have rendered the title nugatory, in violation of a basic principle of contract interpretation.  *Int'l Bhd. of Elec. Workers Local No. 683 Pension Tr. v. Advantage Enterprises, Inc.*, 813 F. Supp. 592, 596 (S.D. Ohio 1993).  It is not as if, as Appellants suggest, the district court interpreted the CBA based solely on the title.  Rather, the district court read the CBA as a whole, finding that it did not include a provision stating that the title should be

disregarded, and that the substantive text was silent as to which industry the CBA covered.  (*See generally* R. 125, PageID.3457-3458).  It then considered the title in light of these factors to determine that "the CBA in this case, by its own literal terms, imposes a payment obligation for employees performing covered work in the construction industry."  (*Id.*, PageID.3458).

Appellants also argue that Article I's use of the phrase "all employees" somehow means that the CBA applies to all employees working in all industries. (Appellants' Brief at pg. 16).  But this is not what Article I says.  As the district court noted, there is nothing in Article I or anywhere in the body of the CBA that suggests that the CBA is *not* confined to work performed in the construction industry.  (R. 125, PageID.3458).  Rather, Article I is already limited to cover "the rates of pay and conditions of employment of all employees of the Employer engaged in but not limited to the" various tasks that follow.   (R. 107-3, PageID.2821).  The CBA thus applies only to employees performing certain types of work.  It is not nearly as broad as Appellants suggest.[1]

The district court's decision is also supported by the following language in Article III: "for the purpose of proving jurisdiction, [the employer] agrees to provide the Union with written evidence of assignment on the Employer's

---

[1] Appellants suggest at various points in their brief that Article II is somehow implicated in this appeal.  However, Article II does not govern this situation: it applies to subcontracting, which is not at issue in this case.

letterhead for certain specified items of work to be performed at a jobsite." (R. 107-3, PageID.2822) (emphasis added). Contract terms must be taken and understood in their "plain, ordinary, and popular sense." *Equitable Life Assur. Soc. of U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) (citation and quotation omitted). The "plain, ordinary, and popular" understanding of "jobsite" is a location where construction work is performed. (*See* www.dictionary.com/browse/worksite; www.glosbe.com/en/en/jobsite; www.wordsense.eu/jobsite/).

If the CBA intended to cover industries other than construction, it could have used another word, such as "worksite," "work location," or "facility." As Pro Services' President explained, a person can perform work at a manufacturing facility, with the work occurring within the construction industry, such as when Pro Services' manufacturing customers hire labor from the construction industry to perform capital expenditures work. Such work might consist of building new facilities or renovating existing buildings, running new lines to install and operate new equipment, and other large-scale building projects. (*See generally* Declaration of Curt Petersen, R. 116-2, PageID.3380). This is classic construction industry work, and the place where the construction workers report is a "jobsite." But when FMTs report to work, it is to a manufacturing facility.

That the CBA is limited to certain types of employees is also consistent with

the rest of the CBA's language, which does not require fringe benefit contributions for *all* hours worked by any employee performing covered work, as the CBA language indicated in *Waggoner v. C & D Pipeline Co.*, 601 F.2d 456, 459 (9th Cir. 1979). Nor does it require contributions for *all* hours paid to each employee, regardless of their classification, as in *Bunn Enterprises v. Ohio Operating Engineers Fringe Ben. Programs*, 606 F. App'x 798, 810 (6th Cir. 2015). Rather, as the district court correctly found, the CBA's language unambiguously reflects an intention to apply only to a certain category of employees, and for fringe benefit fund contributions to be made only on behalf of that category of employees. The district court properly considered the CBA's title, in conjunction with the rest of its terms, to resolve any "doubt" about the industry implicated by the CBA

Pro Services is entitled to rely upon the words used in the CBA. After all, the purpose of ERISA's requirement that employee benefit plans be established pursuant to a written instrument is to provide the parties "certainty and predictability." *Operating Engineers Loc. 324 Health Care Plan v. G&W Const. Co.*, 783 F3d 1045, 1051 (6th Cir. 2015) (*en banc*). This is particularly true given that Pro Services did not negotiate the contract directly – it receives a copy of the final document after it is negotiated at a national level, then modified by the local employer association and union. *See McKinstry Co. v. Sheet Metal Workers' Intern. Ass'n, Local Union No. 16*, 859 F.2d 1382, 1389 (9th Cir. 1988). If the

intent was for the CBA to apply to industries other than construction, the CBA could easily have said so, and yet – it does not. Its title says it applies only to the construction industry.

Pro Services is not, as Appellants argue, trying to avoid a payment obligation. If that was its true motivation, it would employ no skilled labor at all or would shirk its duty to make fringe benefit contributions on those union employees' behalf. But that is not the circumstance here. Pro Services employs unionized labor and pays fringe benefits on their behalf. However, it developed an entire second business division that supplies non-union labor to manufacturing facilities, relying in part upon the plain language in the CBA.

It is understandable that Appellants do not like the district court's decision, as it leaves them without an avenue to recover a large amount of money, despite the fact that their funds do not provide benefits to the non-union FMTs. But Appellants have not given this Court any reason to disturb the district court's ruling, which is rooted in the correct application of the "Titles-and-Headings" canon and other rules of contract interpretation. There was no error and the district court's decision should be affirmed.

## **CONCLUSION**

The district court's decision was rational, appropriate, and based on longstanding contract law principles. Affirming it will not create a conflict among the circuits – the Sixth Circuit has at least once before done precisely what the district court did here: considered a title to, as the Supreme Court stated in *Trainmen*, resolve a "doubt." Summary judgment in favor of Pro Services was appropriate and the district court should be affirmed.

GIARMARCO, MULLINS & HORTON, PC

By: /s/Elizabeth A. Favaro
    Elizabeth A. Favaro (P69610)
    Attorneys for Defendant/Appellee Pro
    Services, Inc.
    Tenth Floor Columbia Center
    101 West Big Beaver Road
    Troy, Michigan 48084-5280
    Phone: (248) 457-7000
    E-Mail: efavaro@gmhlaw.com

Date: September 27, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) in that it contains 13,000 words, and that the typeface and type style requirements of 14 point Times New Roman pursuant to Fed. R. App. P. 32(a)(5) and 32(a)(6) have been complied with.  In certifying the number of words in the brief I have relied on the word count of the word-processing system used to prepare the brief.

/s/Elizabeth A. Favaro
Elizabeth A. Favaro
Attorney for Defendant/Appellee

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2022, I caused the foregoing brief to be filed and served through the Court's CM/ECF system.  All counsel of record that are registered CM/ECF users:

Frank D. McAlpine,
Attorney for Appellants
610 University Drive
East Lansing, Michigan 48823
517-449-3847
Fdmcalpine@gmail.com

/s/Elizabeth A. Favaro
Attorney for Defendant/Appellee

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RECORD | DESCRIPTION | PAGE ID |
|---|---|---|
| 106 | Pro Services' renewed Motion for Summary Judgment | 2771-2772 |
| 107 | Pro Services' Brief in support of renewed Motion for Summary Judgment | 2772-2795 |
| 107-2 | Exhibit A to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2799-2818 |
| 107-3 | Exhibit B to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2820-2841 |
| 107-5 | Exhibit D to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2850-2853 |
| 107-6 | Exhibit E to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2855-2857 |
| 107-7 | Exhibit F to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2859 |
| 107-8 | Exhibit G to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2862-2863 |
| 107-10 | Exhibit I to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2868-2869 |
| 107-11 | Exhibit J to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2871 |
| 107-12 | Exhibit K to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2873- 2876 |
| 107-13 | Exhibit L to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2878 |
| 107-14 | Exhibit M to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2881-2882 |
| 107-15 | Exhibit N to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2884 |
| 107-16 | Exhibit O to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2885-2915 |
| 107-16 | Exhibit O to Pro Services' renewed Brief in Support of Motion for Summary Judgment | 2908 |
| 111 | Plaintiffs' Brief in Opposition to Pro Services' renewed Motion for Summary Judgment | 3262-3290 |

| RECORD | DESCRIPTION | PAGE ID |
|--------|-------------|---------|
| 116-2 | Exhibit A to Pro Services' Reply to Response to renewed Motion for Summary Judgment | 3380-3381 |
| 125 | Opinion and Order | 3457-3458 |
| 128 | Plaintiffs' Brief in Support of Motion for Reconsideration | 3463-3466 |
| 132 | Order Denying Motion for Reconsideration | 3531-3532 |
| 133 | Notice of Appeal | 3533 |